DAVID E. PATTON
FEDERAL DEFENDERS OF NEW YORK
DEIRDRE D. VON DORNUM
Assistant Federal Defender
One Pierrepont Plaza – 16th Floor
Brooklyn, NY 11201
Tel: (718)330-1208
Email: Deirdre_Vondornum@fd.org

Attorneys for Defendant
RAHEEM BERT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RAHEEM BERT, | NO. 12-CR-100 (RRM)<br><br>**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE; DECLARATION OF RAHEEM BERT; DECLARATION OF MICHELLE ANDERSON** |

TO: LORETTA E. LYNCH, UNITED STATES ATTORNEY; AND DOUGLAS PRAVDA, ASSISTANT UNITED STATES ATTORNEY.

Defendant Raheem Bert, by and through his attorney of record, Assistant Federal Defender Deirdre D. von Dornum, will and hereby does move for an order suppressing all items of tangible evidence seized during the NYPD's illegal seizure and search of Mr. Bert on January 19, 2012, and all statements made by Mr. Bert to law enforcement officers during and subsequent to that illegal seizure and search.

This motion is brought on the following grounds: (A) the handgun, ammunition, and statements were the products of an unreasonable seizure, in violation of the Fourth Amendment; and (B) the statements were not the product of a knowing, intelligent, and voluntary *Miranda* waiver, in violation of the Fifth Amendment.

This motion is based on the attached memorandum of points and authorities, the attached declarations, the files and records in this case, and any additional evidence or argument that may be

presented to the Court at or before the hearing on this motion.

Respectfully submitted,

DAVID E. PATTON
Federal Defenders of New York
Attorney for Defendant
RAHEEM BERT
One Pierrepont Plaza – 16th Floor
Brooklyn, New York 11201
Tel: (718) 330-1208
Email: Deirdre_Vondornum@fd.org

Dated: June 25, 2012

By _____
DEIRDRE D. VON DORNUM
Assistant Federal Defender

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The indictment charges defendant Raheem Bert with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and one count of possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). Mr. Bert anticipates that, at trial, the government will seek to introduce a handgun and ammunition that local police officers seized, as well as statements he made subsequent to his arrest. The handgun and statements should be suppressed because they were obtained in violation of the Fourth Amendment. The statements should also be suppressed because they were obtained in violation of Mr. Bert's Fifth Amendment rights as recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966).

## II.

## STATEMENT OF FACTS[1]

On the evening of January 19, 2012, Raheem Bert went to visit his girlfriend, Michelle Anderson, at her apartment located at 55 Holland Avenue, Apartment #10L, Staten Island, New York. *See* Declaration of Raheem Bert, ¶ 3. attached as Exhibit A, (hereinafter "Bert Decl."). Mr. Bert was wearing black sweatpants and a black sweatshirt. *Id.* Before he went to her apartment, Mr. Bert had been smoking angel dust and was quite high. *Id.*; Declaration of Michelle Anderson, at ¶ 5, attached as Exhibit B (hereinafter "Anderson Decl."). Mr. Bert was with his friend, "Cal," and Cal's wife. Bert Decl. at ¶ 4. Ms. Anderson buzzed Mr. Bert and his two friends into the building. Anderson Decl. at ¶ 4. The two men and one woman went upstairs to Mr. Bert's girlfriend's apartment. *Id.* at ¶ 5. Mr. Bert went inside the apartment and spoke to his girlfriend, and then left the apartment. *Id.*

Two New York Police Department ("NYPD") police officers, Officer John Fahim and Officer Besim Pelinku of the 120th Precinct, approached Mr. Bert, Cal, and Cal's wife in the hallway outside of Ms. Anderson's apartment. The NYPD had received a 911 call at about 8:50 p.m. that evening, during

---

[1] All facts other than those derived from Mr. Bert's declaration and Ms. Anderson's declaration are based on information and belief from defense counsel's review of discovery materials.

which a man claimed that several black males were trespassing at 55 Holland Avenue. 55 Holland Avenue is a large apartment building; the NYPD regularly receives telephone calls from that location regarding trespassing. The 911 caller claimed that the black males had been informed to get out of the building but would not move. He described one of the men as wearing dark blue sweatpants, a red baseball cap, and a black jacket. He described a second man as wearing grey sweatpants, a black jacket, and no hat. Officers Fahim and Pelinku responded to that 911 call. The security guard at the building informed Officer Fahim that a bunch of males might be congregating on the 10th floor or 12th floor of the building. Officers Fahim and Pelinku went to the 10th floor. They saw Mr. Bert, Cal, and Cal's wife standing outside of apartment #10L, and approached them.

Officer Fahim asked Mr. Bert, Cal, and Cal's wife what they were doing in the hallway. Bert Decl. at ¶ 3. They replied that they were visiting someone in apartment 10L, the door to which they were standing near. *Id.* The officers indicated to them that they were going to check out their story, and stood between them and the elevator. One of the officers knocked on the door of 10L, and Ms. Anderson verified that she knew them and they had been visiting her. *Id.*; Anderson Decl. at ¶ 7. After receiving this verification that the three of them were not trespassing, but rather had permission from a tenant to be in the building, the officers continued to block their exit from the hallway. *Id* at ¶ 4. Subsequently, the officers allegedly saw Mr. Bert toss a gun out the window of the hallway while they were standing near him, and allegedly saw a magazine fall to the floor. The officers grabbed Mr. Bert, handcuffed him, and searched him. *Id.* at ¶ 5. They then dragged him to the elevator. *Id.* Mr. Bert was screaming and extremely agitated. *Id.* at ¶ 5-6.

The officers placed Mr. Bert in a police car and drove him to the 120th precinct. *Id.* at ¶ 6. In the car, they questioned him about a gun, without first advising him of his rights. They threatened him repeatedly. *Id.*

The officers took Mr. Bert to the 120th precinct for booking and further questioning. Mr. Bert was still high on angel dust. At the time he was booked, it was noted that his complexion was "flushed/ruddy." One of the Detectives read Mr. Bert his *Miranda* rights, and Mr. Bert signed a form indicating that he understood those rights. He has no recollection of being told his rights or signing a form waiving them. *Id.* at ¶ 7. The officers questioned Mr. Bert and he allegedly made inculpatory

4

statements, but he does not recall what if anything he said because of his state of intoxication. *Id.* On January 30, 2012, Mr. Bert was questioned by an ATF agent and allegedly made further inculpatory statements.

## III.

## ARGUMENT

**A. THIS COURT SHOULD SUPPRESS THE GUN AND STATEMENTS BECAUSE THEY ARE THE PRODUCTS OF AN UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT**

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV; *Welsh v. Wisconsin*, 466 U.S. 740, 748-50 (1984). This prohibition against unreasonable searches and seizures extends to "brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002). Where a police officer has "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." the officer may briefly stop the individual and make inquiries aimed at confirming or dispelling that suspicion. Terry v. Ohio, 392 U.S. 1, 22-23, 30 (1968). Reasonable suspicion unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The reasonableness of a Terry stop is assessed based on what the officers knew *before* the suspect was seized. See Florida v. J.L., 529 U.S. 266, 271 (2000). Any evidence obtained pursuant to, or subsequent to, an investigatory stop that was not reasonable in the totality of circumstances must be suppressed as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). Finally, it is the government who bears the burden of showing that the stop and search of Mr. Bert did not violate the Fourth Amendment. United States v. Calvente, 722 F.2d 1019 (2d Cir. 1983).

Mr. Bert was seized for Fourth Amendment purposes when the officers stood in front of him, blocking his egress, and he submitted to their authority. See, e.g., Kaupp v. Texas, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of the Fourth Amendment occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go

about his business.") (internal quotation omitted); California v. Hodari D., 499 U.S. 621, 626 (1991) (A seizure occurs when there is either (a) a laying on of hands or application of physical force to restrain movement or, (b) submission to "a show of authority"). At the time Mr. Bert was seized, the police did not have reasonable suspicion that he was committing or had committed a crime. He was not with a group of males and his clothing did not match the description given of two of the trespassers by the 911 caller. While the police could have made inquiries of him, they did not have a basis to block his egress. Their doing so violated the Fourth Amendment.

Even if, *arguendo*, the police had a sufficient basis to stop Mr. Bert prior to verifying that he had permission to be in the building, once his girlfriend explicitly verified that he was visiting her, the police no longer had any basis to detain him. Despite this, the police did not allow Mr. Bert to leave, but, rather, continued to prevent him from going about his business. Accordingly, all evidence recovered after this point must be suppressed as fruit of the poisonous tree, including the gun, ammunition, and all statements made to law enforcement at any point.

**B.    THIS COURT SHOULD SUPPRESS THE STATEMENTS BECAUSE MR. BERT DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS *MIRANDA* RIGHTS**

The police questioning of Mr. Bert in the car, while he was handcuffed and under arrest, but prior to his having been advised of his Miranda rights, clearly violated his Fifth Amendment rights, and no statements he made during this time should be admitted against him.

After he was brought to the police station, Mr. Bert signed a Miranda waiver. The Supreme Court has held, however, that even where the procedural safeguards of *Miranda* are satisfied, a defendant in a criminal case is deprived of due process of law if his conviction is founded on unknowing, unintelligent, or involuntary statements. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964). Before the government may introduce a defendant's statements at trial, the court must conduct a hearing to determine whether the statements were voluntary. 18 U.S.C. § 3501.

The government has the burden of proving that statements are voluntary by a preponderance

of the evidence. *Lego v. Twomey*, 404 U.S. 477, 483 (1972). An accused's confession must result from an "independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Martin v. Wainwright*, 770 F. 2d 918, 924 (11th Cir. 1985), *modified*, 781 F.2d 185 (11th Cir. 1986) (quotations omitted). In assessing a waiver's validity, the court's determination must be made upon consideration of the totality of circumstances and in light of the presumption that the defendant did not waive his rights. *See United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990). And in considering the totality of circumstances, a court considers the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). One such characteristic of the accused a court considers is the defendant's "mental condition." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus."). Courts have considered a defendant's level of intoxication in assessing voluntariness and knowingness in the validity of waivers and confessions. *See, e.g., Townsend v. Sain*, 372 U.S. 293, 309 (1963) ("If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement.")

Here, when Mr. Bert signed the <u>Miranda</u> waiver and was questioned by law enforcement officers, he was extremely high on angel dust. According to the National Institute on Drug Abuse, angel dust, or PCP, is a "'dissociative drug,' meaning that it distorts perceptions of sight and sound and produces feelings of detachment (dissociation) from the evironment and self." *See DrugFacts: Hallucinogents - LSD, Peyote, Psilocybin, and PCP*, National Institute on Drug Abuse (last updated June 2009), *available at* http://www.drugabuse.gov/publications/drugfacts/hallucinogens-lsd-peyote-psilocybin-pcp ("Among the adverse psychological effects reported [of PCP] are ... [s]ymptoms that mimic schizophrenia, such as delusions, hallucinations, paranoia, disordered thinking, and a sensation of distance from one's environment."). While under the

influence of angel dust, the officers threatened him in the police car with violence if he did not answer their questions. Those threats stayed with him when he was being questioned in the police station. Depending on how much PCP is taken, the drug's effects can last four to six hours. *See id.* Under this combination of circumstances, Mr. Bert did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; accordingly, his statements were taken in violation of the Fifth Amendment and should be suppressed.

## IV.

## CONCLUSION

For the foregoing reasons, Mr. Bert respectfully requests that the Court suppress all evidence resulting from the government's warrantless seizure of him on January 19, 2012.

Respectfully submitted,

DAVID E. PATTON
Federal Defenders of New York
Attorney for Defendant
RAHEEM BERT
One Pierrepont Plaza – 16th Floor
Brooklyn, New York 11201
Tel: (718) 330-1208
Email: Deirdre_Vondornum@fd.org

Dated: June 25, 2012       By _____
Deirdre D. von Dornum
Assistant Federal Defender

# EXHIBIT A

# DECLARATION OF RAHEEM BERT

I, Raheem Bert, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

1) I am the defendant in this criminal action, and make this Declaration in support of a motion to suppress evidence.

2) This Declaration is based on my best recollection of the events it describes. Because its purpose is limited to establishing that my constitutional rights were violated, it does not contain every detail of what occurred.

3) On the evening of January 19, 2012, I went to visit my girlfriend, Michelle Anderson, at 55 Holland Avenue, Apartment #10L, Staten Island, New York. I was wearing black sweatpants and a black sweatshirt. Before I went, I had been smoking angel dust and was really high.

4) I went upstairs to my girlfriend's apartment with my friend, Cal, and his wife. I went inside my girlfriend's apartment and spoke to her. Right after I came out of her apartment, two police officers came down the hall towards us. They asked us what we were doing there, and we explained that we were visiting someone in apartment 10L. The officers knocked on the door of 10L, and my girlfriend verified that she knew us and we had been visiting her.

5) After receiving this verification that we had permission from a tenant to be in the building, the officers moved closer to us, blocking our exit from the hallway.

6) The officers grabbed me, put me on the floor, handcuffed me, and searched me.

They dragged me down the hallway face-down and put me in the elevator. I was screaming.

6) The officers took me to the police station in a police car. On the way to the police station, I was still very agitated. The officers questioned me in the car about a gun, and threatened me.

7) I have seen a form that says I waived my rights and agreed to speak to the officers, but because I was high on angel dust that night, I do not recall being told my rights or signing a form. I also do not recall what statements I may have made.

I declare under the penalty of perjury that the above facts are true and correct to the best of my knowledge and recollection.

DATED:

*[signature]*
RAHEEM BERT

# EXHIBIT B

## DECLARATION OF MICHELLE ANDERSON

I, Michelle Anderson, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

1) I make this Declaration in support of a motion to suppress evidence filed by Raheem Bert.

2) This Declaration is based on my best recollection of the events it describes. Because its purpose is limited to the question of whether Raheem Bert's constitutional rights were violated, it does not contain every detail of what occurred.

3) On the evening of January 19, 2012, I was at home in my apartment at 55 Holland Avenue, Apartment #10L, Staten Island, New York, together with my daughter and my two cousins.

4) At about 9 p.m. that evening, my boyfriend, Raheem Bert, came to visit me. He buzzed my apartment at the front door of the building, and I buzzed him in so that he could come upstairs.

5) Raheem and his friend, "Cal," and Cal's wife came to my apartment. Raheem came inside. Raheem was noticeably high when he was in the apartment. After he left, I began giving my daughter a bath.

6) Shortly thereafter, I heard a knock on the door of my apartment, but I could not answer it immediately because I had my daughter in the bathtub. When I opened the door, a police officer was standing squarely in front of my door, blocking my view of the hallway. Another police officer was standing in the middle of the

hallway.

7) The officer standing in front of my door asked me if "they" had been visiting me. I did not know who he was talking about, so I tried to look around him into the hallway. I heard Cal say "Michelle, Michelle," so I gathered that the officer was talking about Cal and Raheem. I told the officer that they had been visiting my apartment, and had just left it. Then the officer asked me if "he" was my boyfriend, pointing toward the side wall nearest my apartment. I looked around the officer and saw Raheem standing near the side wall, so I told the officer that Raheem was my boyfriend.

8) The officers began speaking to Raheem and Cal, and I closed the door of the apartment so that I could continue getting my daughter ready for bed. I heard a loud commotion outside.

I declare under the penalty of perjury that the above facts are true and correct to the best of my knowledge and recollection.

DATED:

_____
MICHELLE ANDERSON